Gregg M. Mashberg (GM 4022)
Brendan J. O'Rourke (BO 2351)
Jenifer deWolf Paine (JP 9393)
PROSKAUER ROSE LLP
1585 Broadway
New York, NY 10036
Tel: 212.969.3000
Fax: 212.969.2900

Attorneys for Plaintiffs and Third-Party Defendant

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

_____

|  |  |  |
|---|---|---|
| LAUGH FACTORY, INC., | : | |
| LAUGH FACTORY TIMES SQUARE, INC., and | : | |
| JAMIE MASADA | : | |
| Plaintiffs, | : | Civil Action No. 08 CV 1887 (JSR) |
| | : | |
| v. | : | |
| | : | |
| RICHARD BASCIANO, | : | |
| 303 WEST 42ND STREET REALTY COMPANY, and | : | |
| 303 WEST 42ND STREET LLC, | : | |
| TIMES SQUARE ARTS CENTER, LLC, | : | |
| 300 WEST 43RD STREET REALTY, INC., | : | |
| | : | |
| Defendants, | : | |
| | : | |

_____:

|  |  |
|---|---|
| RICHARD BASCIANO, | : |
| 303 WEST 42ND STREET REALTY COMPANY, and | : |
| 303 WEST 42ND STREET LLC, | : |
| | : |
| Third-Party Plaintiffs, | : |
| | : |
| v. | : |
| | : |
| JAMIE MASADA, | : |
| | : |
| Third-Party Defendant. | : |
| | : |
| | : |

_____:

**AMENDED COMPLAINT, JURY DEMAND, AND REQUEST FOR INJUNCTIVE RELIEF**

Plaintiffs Jamie Masada, Laugh Factory, Inc., and Laugh Factory Times Square, Inc., by their attorneys, for their amended complaint against Defendants, allege as follows:

**Nature of the Claims**

1.      This is an action for trademark infringement, unfair competition and trademark dilution under 15 U.S.C. §§ 1114, 1125(a), 1125(c), and for deceptive acts and practices, state dilution, misappropriation, breach of contract, violation of covenant of good faith and fair dealing, an accounting, rescission of contract and/or a declaration of invalidity of contract on grounds of no consideration and coercion, and fraudulent inducement under New York state law, all arising out of Defendants' fraudulent business dealings with Plaintiffs.

2.      This action arises out of Defendants' unauthorized use of the federally registered and incontestable mark LAUGH FACTORY to identify a comedy club, and their unauthorized use of the unregistered mark of a Triple Arch ("Triple Arch Mark") to identify a comedy stage and/or comedy club, constituting infringement, dilution, and misappropriation of Laugh Factory's exceedingly strong and famous LAUGH FACTORY and Triple Arch trademarks in a manner likely to cause confusion, mistake, and deception among consumers.  Laugh Factory seeks preliminary and permanent injunctive relief, compensatory and punitive damages, profits, and attorneys' fees.

3.      This action also arises out of the Defendants' fraudulent inducement of Plaintiffs into an unconscionable business relationship in which Plaintiffs were exploited, and subjected to intimidation and coercion.  During the course of this business relationship, Plaintiff Masada, on behalf of Laugh Factory of Times Square, Inc., advanced substantially over $500,000 to

develop a LAUGH FACTORY club in New York and devoted his skills and energies to the business, but never received a dime in return during the entire period which Defendants claim that Laugh Factory of Times Square, Inc. was a member of the limited liability company that operated the business.

4.     During this same period, upon information and belief, Basciano, or persons or entities acting on his behalf, pocketed substantial sums from the business, perhaps totaling millions of dollars, but Plaintiffs have been blocked from access to the relevant financial records.

## Jurisdiction and Venue

5.     This Court has jurisdiction over the subject matter of this action pursuant to the Lanham Act, 15 U.S.C. § 1121, and 28 U.S.C. §§ 1331 and 1338, and under the principles of supplemental jurisdiction pursuant to 28 U.S.C. § 1367.  Declaratory relief is authorized pursuant to 28 U.S.C. § 2201.

6.     This Court has personal jurisdiction over Defendants because Defendants are located in and/or reside in the State of New York and within this judicial district, are doing business in the State of New York and in this judicial district, and have committed tortious acts within the State and within this judicial district, and the claims arise out of such tortious acts. Venue is proper in this district under 28 U.S.C. § 1391 and § 1400.

## Parties

7.     Plaintiff Jamie Masada ("Masada") is a resident of the state of California.

8.     Plaintiff Laugh Factory, Inc. is a corporation formed under the laws of the State of California, and has a principal place of business at 8001 Sunset Boulevard, Hollywood, CA

90046. Laugh Factory, Inc. owns and operates the world famous LAUGH FACTORY comedy clubs located in Los Angeles and Highland, California, and is expected to open another club in Long Beach, California in June 2008. Masada is the President of Laugh Factory, Inc.

9.     Plaintiff Laugh Factory Times Square, Inc. is a corporation formed under the laws of the State of New York, and has a principal place of business at 8001 Sunset Blvd., Hollywood, CA 90046. Masada is the Chief Executive Officer of Laugh Factory Times Square, Inc.

10.     Upon information and belief, Defendant Richard Basciano is a U.S. citizen and a resident of the State and City of New York, County of New York.

11.     Upon information and belief, Defendant 303 West 42nd Street Realty Company is a d/b/a of Richard Basciano, and is located in the State and City of New York, County of New York.

12.     Upon information and belief, Defendant 303 West 42nd Street LLC is a Delaware limited liability company registered to do business in New York and located in the State of New York, County of New York.

13.     Upon information and belief, Defendant Times Square Arts Center, LLC is a New York Limited Liability Company located in the State of New York, County of New York.

14.     Upon information and belief, Defendant 300 West 43rd St. Realty, Inc. is a New York corporation located in the State of New York, County of New York.

**Background Facts Common to All Claims for Relief**

15.     Plaintiff Laugh Factory, Inc., through itself and its predecessor, has been operating a comedy club in Los Angeles under the name LAUGH FACTORY continuously since 1979.  The first comedian to perform at the now world famous Laugh Factory comedy club was Richard Pryor.  Since then, many of America's greatest comedians have performed at Plaintiff's comedy club, including Tim Allen, Louie Anderson, Roseanne Barr, John Belushi, David Brenner, Jim Breuer, George Burns, George Carlin, Jim Carrey, Johnny Carson, Dane Cook, Dave Chappelle, Rodney Dangerfield, Ellen Degeneres, Jamie Foxx, Brad Garrett, Kathy Griffin, Buddy Hackett, Bob Hope, Dom Irrera, Kevin James, Alan King, Martin Lawrence, Jay Leno, George Lopez, John Lovitz, Bernie Mac, Bill Maher, Howie Mandel, Steve Martin, Jackie Mason, Carlos Mencia, Dennis Miller, Eddie Murphy, Paul Reiser, Chris Rock, Paul Rodriguez, Ray Romano, Bob Saget, Mort Sahl, Adam Sandler, Jerry Seinfeld, Garry Shandling, Sinbad, Chris Tucker, Damon Wayans, Robin Williams, Jonathan Winters, and Steven Wright, among many others.

16.     The Laugh Factory comedy club has been called the "number one comedy club in the country" by USA Today.  It is the subject of a DVD entitled *Live From The Laugh Factory, Vol.I.*  As stated in Frommer's 2008 California travel guide book, "just about every comedian you've seen on TV – living or dead – has been a regular at the Laugh Factory . . . you never know when a celebrity guest is going to sneak onstage and try out a new routine."  The Laugh Factory comedy club in Los Angeles is regularly visited by tourists from around the country.  In short, it is perhaps the best known comedy club in the United States, if not the world.

17.     Comedians frequently use an appearance at the Laugh Factory comedy club to get additional work and further their careers – the image of a comedian performing on Laugh

Factory's unique and distinctive stage (as defined below) in front of the Laugh Factory Logo (as defined below) is a badge of honor.

18.     The Laugh Factory, Inc., founder, president, and creative force, Plaintiff Masada, is extremely well known in the field of professional comedy.  He has been called a "true visionary" by the New York Times.

19.     Masada has enjoyed a lengthy career as a consultant and producer on some of Hollywood's most successful comedy film franchises, as well as on numerous network and cable television shows.  His knowledge and expertise has made Masada the leading authority on all things comedy and his advice is very highly regarded amongst the entertainment industry's top power brokers. Many in the industry seek his guidance, and he remains a mentor to performers and industry professionals.

20.     Masada produced the late-night show *Vibe* with Quincy Jones.  Masada's knack for spotting talent and his uncanny business genius is superbly illustrated by his work with the hit television show *In Living Color*.  He was instrumental in getting the Fox Network to audition two of its biggest break-out stars, Jim Carrey and Jamie Foxx.  Masada, along with Bob Israel, was the driving force to get the hit film *Ace Ventura: Pet Detective* off the ground.  He was also a co-producer of the feature film *Rocket Man* for Disney.

21.     Most recently, Masada created and produces the DirecTV program, *Supreme Court of Comedy*, currently in its second season.  He also created and produced the program, *Behind the Scenes at the Laugh Factory* with Paul Rodriguez and produced a film with Damon Wayans entitled *Behind the Smile at The Laugh Factory*, featuring numerous popular comedians.

22.     Masada's passion for comedy is closely matched by his charitable contributions. His work with underprivileged children won him a NAACP Freedom Award, The Ellis Island Medal of Honor for humanitarian efforts, as well as the ACLU Freedom of Speech Award, among many others. For the past 25 years, Masada operates and personally funds a program called the Laugh Factory Camp—it is a comedy camp for underprivileged inner-city children. Masada recruits the hottest comedians to come to the camp to teach their craft to children between the ages of 8 and 16. Masada's work with the camp was the subject of a two-hour PBS documentary. The cause of working with and helping children is very near and dear to Masada's heart.

23.     Plaintiff Laugh Factory, Inc., by itself and through its predecessor, has continuously used the LAUGH FACTORY trademark in connection with its comedy club since 1979. By virtue of this long, continuous, exclusive, and high profile use, and through extensive promotion, sales, and third party media attention throughout the United States and around the world, Plaintiff has developed substantial goodwill, consumer recognition, and value in the LAUGH FACTORY trademark. The LAUGH FACTORY trademark is strong and famous, and thus is entitled to a wide scope of protection under federal and state trademark laws.

24.     Also by virtue of Plaintiff Laugh Factory, Inc.'s continuous and exclusive use, and through extensive advertising, promotion, sales, and media attention throughout the United States and the world, the LAUGH FACTORY trademark has come to be recognized and relied upon by the relevant trade and consuming public in the United States as identifying services originating exclusively from the same source. The LAUGH FACTORY trademark has great recognition and has come to represent and embody Plaintiff Laugh Factory, Inc.'s valuable goodwill and reputation.

25.     LAUGH FACTORY is the subject U.S. Trademark Registration No. 1,314,593 for "comedy magazines", "shirts", and "entertainment services, namely comedy presentations." In addition, LAUGH FACTORY with a design element that is used at the club and on merchandise (the "Laugh Factory Logo") is the subject of U.S. Trademark Registration No. 1,721,950 for "tote bags" and "men's and women's jackets, trousers, sweat pants, t-shirts, shirts, shoes, and caps." The Laugh Factory Logo appears as follows:



26.     Both U.S. Reg. No. 1,314,593 and 1,721,950 are owned by Plaintiff Laugh Factory, Inc. They are both valid and subsisting, and have both obtained incontestable status.

27.     Plaintiff Laugh Factory, Inc., by itself and through its predecessor, have consistently used the distinctive unregistered Triple Arch Mark to identify its comedy club stages.  The Triple Arch Mark is characterized by three stacked arches that serve as a form of proscenium or background on the comedy club stage, underneath which comedians perform.  For more than 10 years the Triple Arch Mark has been an element of the LAUGH FACTORY stages.  Countless comedy shows have occurred on the LAUGH FACTORY stages, many of which have been taped, recorded and broadcast worldwide.  These tapes and broadcasts prominently show not only the LAUGH FACTORY trademark and Logo, but also the Triple Arch Mark.  By virtue of this long, continuous, exclusive, and high profile use, and through extensive promotion, sales, and third party media attention throughout the United States and around the world, Plaintiff has developed substantial goodwill, consumer recognition, and value in the Triple Arch Mark.  The Triple Arch Mark is strong and famous, and thus is entitled to a wide scope of protection under federal and state trademark laws.

### Defendants' Wrongful Acts

### Background

28.     This action arises out of Defendants' abusive business dealings with Plaintiffs.  When Masada met Basciano, Basciano (and/or 303 West 42nd Street LLC) was the owner of a large commercial space located in New York City at 42nd Street and 8th Avenue that had been sitting empty for many months after Basciano's adult entertainment establishment, SHOW WORLD, had run into legal issues.  SHOW WORLD was referred to by the New York Times in 1995 as "the brightest of the gaudy lights in the pornographic firmament of Times Square."

29.     In an attempt to bolster his image, as well as fill vacant real estate, Basciano convinced Masada to go into business with him and open a LAUGH FACTORY comedy club in

the vacant SHOW WORLD space, after falsely leading Masada to believe that Basciano had been recommended to Masada by the Times Square Business Improvement District (the "Times Square BID").

30.     Basciano and Masada and their respective representatives negotiated various documents regarding a Laugh Factory comedy club in New York, but the negotiations were never finalized and no agreements were ever executed.  The parties, however, operated a comedy club under the LAUGH FACTORY trademark – with Basciano maintaining exclusive control over the financial affairs – that took in, upon information and belief, millions of dollars. Upon information and belief, Basciano diverted substantial revenues from the business to himself and/or his controlled entities and made it appear that the club never made a profit. Basciano made various promises to Masada about the return of his investment, all of which were flagrantly violated and Masada received not a single cent during the entire time that Defendants allege that Laugh Factory of Times Square, Inc. was a member of The LLC (as defined below in Paragraph 37).

**History of the Parties' Dealings**

31.     In 2003, Plaintiffs became interested in opening a Laugh Factory comedy club in New York City.  Masada was introduced to two individuals named Ben Kolbert and Michael Goldberg.

32.     Kolbert identified himself as being associated with the Times Square BID, and represented to Masada that he was very friendly with the Mayor, and that he could arrange for tax incentives and grants from the City if Plaintiffs were to open a comedy club in the building

owned by Basciano and/or 303 West 42nd Street LLC located at 303 West 42nd Street, New York, NY and 300 West 43rd Street, New York, NY.

33.     Kolbert suggested that Masada go into business with Basciano.  Kolbert and Goldberg introduced Masada to Basciano.  At some time after their initial introduction, Basciano called Masada and proposed to Masada that they work together to open a LAUGH FACTORY comedy club in his building.

34.     Upon information and belief, and unknown to Masada at the time, Kolbert was not employed by the Times Square BID.  Upon information and belief, Kolbert was an agent of Basciano and acting on Basciano's behalf.

35.     After the parties began their working relationship (as detailed below), Basciano told Masada that Masada "had to" make a cash payment to Goldberg in the amount of $7,000 for introducing them.  Masada gave Goldberg $1,500 in cash and wrote him a check from the Laugh Factory, Inc. account for $5,500.

**The Creation of Times Square Club**

36.     In or about late 2003, Masada and Basciano agreed to open a LAUGH FACTORY comedy club in Times Square through entities controlled by each of them on a 50/50 basis. Extensive documents regarding the proposed relationship were drafted and negotiated by counsel for the parties, but the negotiations were never finalized on material points and the documents were never executed.

37.     On or about November 13, 2003, Basciano's lawyer, M. David Baker, formed an entity called The World Famous Laugh Factory of NYC, LLC, a New York limited liability company as the entity to operate the club ("The LLC").  Various instruments, including an

operating agreement for The LLC, a trademark license, and a lease for the premises were drafted, but their material terms were never finalized nor were the documents executed.

38.     Masada formed Laugh Factory of Times Square, Inc. to be a member of The LLC. For the tax years 2004-2006, Basciano caused Form K-1s to be issued by The LLC to Laugh Factory of Times Square, Inc., showing it to be a 50% owner of the business.

39.     The LLC opened as a comedy club under the name LAUGH FACTORY at 669 – 677 8th Avenue (a/k/a 303 West 42nd Street and 300 West 43rd Street, New York, NY (the "Times Square Club") on or about March 27, 2004.  The Times Square Club prominently and repeatedly used the LAUGH FACTORY trademark as well as the Laugh Factory Logo, in signage, merchandising, advertising, and promotional materials.

40.     When Plaintiffs and Defendants designed and arranged for the construction of the comedy stage for the Times Square Club, they made the conscious decision to replicate the stages of the other LAUGH FACTORY clubs as closely as possible.  The stage design purposefully included the famous Triple Arch Mark as the backdrop to the stage to further associate itself with the other LAUGH FACTORY clubs.

41.     Similarly, the marquee outside of the Times Square Club purposefully incorporated the Triple Arch Mark to further associate itself with the other LAUGH FACTORY clubs.

42.     The Times Square Club operated under the LAUGH FACTORY name with Plaintiff Laugh Factory, Inc.'s permission until September 14, 2007.  During that time, Jamie Masada was a regular consultant to the Times Square Club, arranging the schedule, booking talent, and approving bookings.   Masada traveled to New York for this purpose twice a month.

Masada had a desk in an office in the same building as the Times Square Club and had a key to the office.

43.     Masada arranged for the placement of advertisements for the club in local New York City publications, which were paid for by The LLC.

44.     Additionally Masada arranged advertising for the Times Square Club in the Hollywood Reporter.  Some of the advertisements were paid for directly by Plaintiffs, some were paid for by hosting private parties for the Hollywood Reporter at the LAUGH FACTORY Los Angeles club.

45.     One or more of the Plaintiffs also paid for the development and maintenance of a Web site for the Times Square Club in conjunction with developing a Web site for the LAUGH FACTORY club in Los Angeles.

46.     Although it was agreed between the parties that Masada would have approval over all bookings, Masada eventually discovered in 2007 that comedians were booked in the club without his knowledge or approval.  Increasingly, Basciano ran the Times Square Club as his own, excluded Masada from the business, and refused to give Masada access to its books and records.   Despite Plaintiffs' substantial monetary investment in the Times Square Club and Masada's devotion of his time and energies, Plaintiffs did not receive any remuneration or reimbursement during the years 2004 – 2006.

47.     The only payments received by any of Plaintiffs, despite the substantial financial investments and Masada's continuous devotion of his energies and talent amount to (according to Defendants) approximately $66,000 paid to Masada in 2007.

**Plaintiffs' Financial Investment In The Times Square Club**

48.     From November 2003 through March of 2004, Masada on behalf of Laugh Factory of Times Square, Inc. advanced The LLC and the Times Square Club $300,000 pursuant to Plaintiffs' agreement with Basciano.

49.     In response to Basciano's demands for additional money, purportedly to cover expenses related to the opening of the Times Square Club, including the headliner's fee, in the Spring of 2004, Masada on behalf of Laugh Factory Times Square, Inc. advanced an additional $100,000 to The LLC.

50.     In August of 2004, Basciano told Masada that the Times Square Club was losing money and needed more of an investment from him.  Masada told Basciano he believed that the Club had to be making money, based on his view of the operation and his knowledge of the industry.  Basciano yelled at Masada and insisted that the Club needed additional funds from Masada.  Basciano then suggested that he prepare a loan document to Masada with a high interest rate and Basciano would then put in the money on Masada's behalf.  Masada did not take the loan, but, on behalf of the Laugh Factory of Times Square, Inc., wrote a check to The LLC for an additional $100,000, bringing the total direct investment in The LLC to $500,000.

**Basciano's Breach of His Obligation to Plaintiffs**

51.     In connection with establishing the Time Square Club and in consideration of the services provided by Masada, Masada and Basciano orally agreed that Masada would receive $4,500 a week, plus expenses, and would be provided with an apartment in 303 West 42nd Street at no expense to Masada.

52.     Neither Masada nor any other Plaintiffs were ever paid $4,500 a week.

53.     Neither Masada nor any other Plaintiffs were reimbursed for expenses.

54.     Despite Basciano's representations, Masada was required to and did pay rent on the apartment in the amount of $1,500 per month until in or about April 2007.

55.     When Masada complained to Defendants' accountant, Frank Cresci, that he was not receiving his salary, Cresci simply told him to talk to Basciano. When Masada spoke to Basciano about his salary, Basciano angrily told him to stop complaining.

56.     Periodically, Defendants' accountant, Frank Cresci, at the direction of Basciano, would direct Masada to sign certain checks on the account of The LLC. Masada complied but, other than the checks written to comedians, he did not know what the checks were for.

57.     Periodically, Masada asked Cresci to see the books and records relating to the Times Square Club. Cresci never showed Masada the books and records of the Times Square Club, but rather told him that they would be sent to The Laugh Factory, Inc.'s accountant, which they never were. The only books or records that Cresci ever showed Masada related to unaccounted for or missing food and beverage supplies.

58.     Cresci sent form K-1s to Laugh Factory of Times Square, Inc.'s accountant, and in 2004 also sent a draft trial balance sheet and income statement. Cresci never sent the actual tax returns for The LLC or any other financial information to Masada or the Laugh Factory of Times Square, Inc.'s accountant.

**Intimidation of Masada By Basciano and His Agents and Employees**

59.     From the time Masada first started collaborating with Defendants, he was submerged into an atmosphere of intimidation:

A.     Basciano routinely shouted, cursed, threatened his employees, and otherwise engaged in volatile conduct in Masada's presence.  This conduct had the effect of intimidating Masada and cowing him to bend to Basciano's will and forbearing from asserting his financial rights with respect to The LLC.

B.     In or about the summer of 2007, Basciano insisted that Masada fly to New York although Masada explained that he had a serious eye ailment and was not supposed to fly.  Basciano insisted.  Masada relented and flew to New York.  As feared, the flight had serious adverse effects on Masada's vision.

C.     The atmosphere of intimidation also included actions and statements by employees of Basciano.  For example, in or about 2005, a bodyguard/security employee of Basciano, Eli, pulled a gun on Masada on the Times Square Club's premises, purportedly by mistake.  Additionally, on opening night of the Times Square Club, Basciano's employee, Thomas Simmonds ("Simmonds") told Masada that if Masada rebooked a certain comedian of whom Simmonds disapproved, somebody could be hurt or killed.

D.     In or about 2004, on two separate occasions, Masada was approached outside of the Times Square Club by men who identified themselves as FBI agents and asked what Masada knew about Basciano.  During one of those occasions, the men showed Masada copies of checks Masada had signed in connection with the Times Square Club.  Masada does not know whether the men were, in fact, FBI agents.

E.     In or about 2006, Masada's apartment in New York (located in the building owned and operated by Defendants) was broken into.  The only things taken were his

business papers regarding the Times Square Club and receipts for entertaining comedians who performed at the Times Square Club. Masada had previously told Basciano's employees that he kept the receipts in the New York apartment.

F.     On or about September 10, 2004, a day Masada was scheduled to fly to Los Angeles, he left his briefcase in the office at 303 W. 43rd Street when he went to lunch. When he returned, he discovered that someone had put marijuana in his briefcase. Masada called the police and filed a report.

G.     In or about the middle of October 2007, Marc Barbanell told Masada that Basciano owed him money for his taxes and that Basciano had said to get the money from Masada. Barbanell insisted that Masada pay him $3,500 and stated in substance that if he did not, someone would get hurt. On or about October 18, 2007, Masada sent Barbanell a check in the amount of $3,500.

H.     Basciano and his agents and employees coerced Masada into signing documents, as set forth below in paragraphs 61 - 98.

60.     As a result of these and other specific incidents, but also as a result of the general atmosphere at the Times Square Club, Masada was perpetually afraid of Basciano and of his and Defendants' employees and agents. As a result, Masada did not protest more vigorously when he was so clearly taken advantage of, had his rights trampled on, when promises made to him were flagrantly broken and, as discussed below, he was coerced into signing documents purporting to adversely affect his legal rights.

### The Coerced February 7, 2007 Document

61.     On February 7, 2007, Masada was called into Basciano's office.

62.     Basciano's employee, Thomas Simmonds, was present in the office, along with another employee.  Basciano subsequently came in.

63.     Masada was seated in a chair opposite Basciano, who was behind his desk. Simmonds stood behind Masada.  There was another person standing across the room.

64.     Basciano or Simmonds presented Masada with a document.

65.     Masada had never seen the document before the meeting.

66.     Basciano told Masada to sign the document.

67.     When Masada asked what it was, Basciano said he was "giving" Masada his "money back."

68.     Masada told Basciano that he had difficulty in reading and asked if he could show it to someone.  Basciano insisted that Masada sign the document.  Simmonds continued to stand close behind Masada.  Masada signed the document  (the "Coerced February 7 Document").

69.     The Coerced February 7 Document was prepared by Basciano or his agents, acting on Basciano's behalf.

70.     Masada had no input into the contents of the Coerced February 7 Document.

71.     Basciano knew that the Coerced Februray 7 Document purported to affect Masada's legal rights.

72.     Basciano knew that Masada had previously been represented by counsel in connection with legal documents concerning The Times Square Club.

73.     Basciano knew that Masada was signing the Coerced February 7 Document without having the document reviewed by Masada's counsel.

74.     Basciano refused to permit Masada to consult with counsel in connection with the Coerced February 7 Document.

75.     Masada's signature on the Coerced February 7 Document was procured by coercion and Masada signed it under duress.

76.     The Coerced February 7 Document purported to provide that Masada would be a business consultant to Basciano at compensation of $100,000 per year for two years, payable in equal monthly installments at the end of each month, and that this amount would be "applied as a reduction against Masada's original funding of $500,000". The Coerced February 7 Document further provided that Masada would be paid 25% of "the profits" also to be "applied as an additional reduction against Masada's original funding amount of $500,000".

77.     In other words, the Coerced February 7 Document had the unconscionable purported result of giving Masada 25% of the profits (capped at, and to be deducted from, the amount of The Laugh Factory Inc.'s $500,000 investment), although The Laugh Factory of Times Square, Inc. had an entitlement of 50% of the profits.

78.     The Coerced February 7 Document also has the unconscionable purported result of increasing Basciano's profit participation initially to 75%, and ultimately to 100%.

79.     In addition, the Coerced February 7 Document states that "If, at the end of the term of the consulting agreement, the building has not been vacated for demolition/re-development then Basciano has the option of extending the consulting agreement or paying Masada any remaining balance of his original $500,000 funding as payment in full."

80.     In other words, if Basciano were to exercise his option to extend the purported consulting agreement and Masada were to decline, Masada would not be entitled to the return of the balance of the $500,000.

81.     The Coerced February 7 Document was unconscionable and did not provide consideration to Masada.

### The Coerced February 28, 2007 Document

82.     On or about February 28, 2007, around 10:00 p.m., Masada was in the Times Square Club and was approached by one of Basciano's employees, Marc Barbanell, who presented Masada with a document and placed the document down in front of Masada with a pen.

83.      Masada had never seen the document before.

84.     Barbanell told Masada to sign the document.

85.     When Masada said he could not sign the document because it was dark, Barbanell said "you don't want him to come down, do you?" – referring to Basciano, and

insisted that Masada "sign it." Masada signed the document (the "Coerced February 28 Document").

86.     Masada was so shaken by the incident that his signature shows that his hand was trembling as he was coerced into signing the document. Masada then had to go sit down in the VIP section of the club for awhile until he stopped shaking. Masada did not know what he had signed.

87.     In causing Masada to sign the Coerced February 28 Document, Barbanell was acting with the knowledge and at the behest of Basciano.

88.     The Coerced February 28 Document was prepared by Basciano or his agents, acting on Basciano's behalf.

89.     Masada had no input into the contents of the Coerced February 28 Document.

90.     Basciano knew that the Coerced Februray 28 Document purported to affect Masada's legal rights.

91.     Basciano knew that Masada had previously been represented by counsel in connection with legal documents concerning The Times Square Club.

92.     Basciano knew that Masada was signing the Coerced February 28 Document without having the document reviewed by Masada's counsel.

93.     Basciano refused to permit Masada to consult with counsel in connection with the Coerced February 28 Document.

94.     Masada's signature on the Coerced February 28 Document was procured by coercion and Masada signed it under duress.

95.     The Coerced February 28 Document is shocking in that while providing no consideration or benefit of any kind to Masada, it purports to provide that Masada indemnifies Basciano and any of his entities from "any and all claims that can or may be asserted by any entity . . . concerning, without limitation, the operation, occupancy, tenancy or any interest whatsoever relating to the World Famous Laugh Factory located at [669 – 677 8th Avenue] . . ."

96.     The Coerced February 28 Document states that the Coerced February 7 Document was attached.  It was not.

97.     Taken together with the Coerced February 7 Document, these two documents not only purport to extinguish the bulk of the Laugh Factory of New York, Inc.'s financial interest in The LLC --  to the corresponding benefit of Bascianio -- but, in a brazen and unconscionable fashion purport to impose responsibility for all claims that could be asserted against the Times Square Club solely on Masada.

98.     The Coerced February 28 Document was unconscionable and did not provide consideration to Masada.

**Plaintiffs' Withdrawal Of Permission To Use The
LAUGH FACTORY Trademark and Withdrawal From The LLC**

99.     On or about June 28, 2007, Masada received a copy of a letter from American Express addressed to The Times Square Club stating that a customer of The Times Square Club had complained that pornographic material had been displayed in the presence of schoolchildren at the Times Square Club.  Masada was extremely upset by this development.

100.     On September 14, 2007, Plaintiff Laugh Factory, Inc. withdrew its permission for the use of the LAUGH FACTORY trademark and Laugh Factory Logo and instructed Defendants to remove all "logos, images and brand references to and about the Laugh Factory by October 15, 2007" (the "Withdrawal Notice").

101.     In or about the middle of October 2007, Defendants changed the lock on Masada's office at the Times Square Club and barred him from entering the premises.

102.     Since receiving the Withdrawal Notice, and until after the original complaint in this lawsuit was filed, Defendants alternately stated (a) that they would remove all LAUGH FACTORY signage, and (b) refused to do so.

103.     After the filing of the original Complaint in this Action, Defendants removed the LAUGH FACTORY trademark and logo from the signage in and outside the Times Square Club.

104.     Upon information and belief, since the name of the Times Square Club has been changed, Basciano has continued to operate the facility as a comedy club.

105.     Upon information and belief, Defendants continue to use and display the Triple Arch Mark to identify the comedy stage at the former Times Square Club location without the permission of Plaintiff Laugh Factory, Inc.

106.     Upon information and belief, Defendants continue to use and display the Triple Arch Mark in its marquee outside the Times Square Club to identify the club as a comedy club without the permission of Plaintiff Laugh Factory, Inc.

107. On February 20, 2008, and after Masada had put Defendants on notice that The Laugh Factory, Inc. had withdrawn its permission for them to use the LAUGH FACTORY trademark, Basciano's lawyer, Baker, caused the name of The LLC to be changed to Times Square Arts Center LLC (a named defendant in this action).

108. Between September 14, 2007 and late March, 2008, Defendants operated a comedy club under the LAUGH FACTORY trademark and the Laugh Factory Logo despite Plaintiffs' express protest.

109. The effect of Defendants' use of the LAUGH FACTORY trademark and the Laugh Factory logo in connection with the Times Square Club was to lead consumers to mistakenly believe that the services offered at the Times Square Club originated with Plaintiffs, or are sponsored by, approved by, or affiliated with Plaintiffs.

110. Following the Withdrawal Notice, Defendants operated their infringing Times Square Club ("the Infringing Times Square Club") with the object and intent of deceiving and misleading consumers into believing that the Infringing Times Square Club was affiliated, connected, or associated with Plaintiffs, or that it originated from, or was otherwise sponsored or approved by Plaintiff. Further upon information and belief, Defendants operated the Infringing Times Square Club with the additional object and intent to misappropriate the goodwill and consumer recognition of Plaintiff's famous LAUGH FACTORY services.

111. Defendants' use of the famous LAUGH FACTORY trademark, Laugh Factory Logo and Triple Arch Mark in connection with the Infringing Times Square Club was and is likely to dilute and blur the distinctive qualities of the famous LAUGH FACTORY trademark,

the Laugh Factory Logo and Triple Arch Mark in the minds of the consuming public and, upon information and belief, Defendants willfully intended to cause such dilution.

112.    While Masada was booking the acts, The Times Square Club drew upon on the same pool of talent as Plaintiff's Laugh Factory clubs in Los Angeles and Highland, California.

113.    Plaintiff Laugh Factory, Inc.'s reputation was damaged during the time period that Defendants operated the Infringing Times Square Club under the LAUGH FACTORY mark following revocation of consent.

114.    Plaintiff Laugh Factory, Inc.'s reputation continues to be damaged by Defendants' continued unauthorized use of the Triple Arch Mark.

115.    After Masada stopped booking the acts, the Times Square Club no longer drew upon the same pool of talent as did Plaintiff's other clubs.  However, consumers attending the Infringing Times Square Club expected to see the same pool of talent for which the Laugh Factory, Inc. is famous and many consumers – tourists and others seeking live comedy performances – attended both Plaintiff's Laugh Factory comedy club and Defendants' Infringing Times Square Club.  Defendants' unauthorized use of the LAUGH FACTORY trademark and Laugh Factory Logo was irreparably damaging Plaintiff's reputation and the reputation of the Laugh Factory comedy clubs in Los Angeles and Highland, California.

116.    The foregoing acts by Defendants are and were willful, intentional, and purposeful, and with callous disregard of Plaintiffs' rights.

117.    The foregoing acts occurred in, or in a manner affecting, interstate commerce.

## First Claim For Relief
### (Trademark Infringement Pursuant to 15 U.S.C. § 1114)

118.     Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 117 as if fully set forth herein.

119.     As detailed above, Defendants used in commerce copies of Plaintiff Laugh Factory, Inc.'s federally registered trademarks in connection with the sale, offering for sale, and advertising of services in manner that was likely to cause confusion, mistake, or to deceive.

120.     The foregoing acts of Defendants constitute a violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1114.

## Second Claim For Relief
### (Unfair Competition Pursuant to 15 U.S.C. § 1125(a))

121.     Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 120 as if fully set forth herein.

122.     Defendants operated a comedy club and sold related merchandise under Plaintiff's LAUGH FACTORY trademark and Laugh Factory Logo in a manner that was likely to cause confusion among the consuming public.

123.     Defendants' acts constituted a false designation of origin and a false description of fact that was likely to cause confusion, or to cause mistake, or to deceive the relevant consuming public concerning whether Defendants' Times Square Club was affiliated, connected, or associated with, or approved by, Plaintiffs.  Defendants' acts were further likely to damage the reputation and goodwill previously established by Plaintiffs Masada and Laugh Factory, Inc. in its LAUGH FACTORY comedy club.

124. The foregoing acts of Defendants constitute a violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).

**Third Claim For Relief**
**(Federal Trademark Dilution Pursuant to 15 U.S.C. § 1125(c))**

125. Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 124 as if fully set forth herein.

126. Plaintiff Laugh Factory, Inc.'s LAUGH FACTORY trademark and Laugh Factory Logo are famous and distinctive.

127. Defendants' acts as described above were likely to dilute the distinctive quality of the LAUGH FACTORY trademark and Laugh Factory Logo.

128. Defendants' acts constitute a violation of Section 43(c) of the Lanham Act, 15 U.S.C. § 1125(c).

**Fourth Claim For Relief**
**(Trademark Infringement and Unfair Competition Pursuant to 15 U.S.C. § 1125(a))**

129. Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 128 as if fully set forth herein.

130. As detailed above, Defendants continue to use in commerce copies of Plaintiff Laugh Factory, Inc.'s unregistered Triple Arch Mark in connection with the sale, offering for sale, and advertising of services in manner likely to cause confusion, mistake, or to deceive.

131. The foregoing acts of Defendants constitute a violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).

**Fifth Claim For Relief**
**(Deceptive Acts and Practices In Violation of N.Y.**
**Gen. Bus. Law § 349 and similar laws in other states)**

132.     Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 131 as if fully set forth herein.

133.     The foregoing acts of Defendants constituted deceptive acts and practices in the conduct of a business, trade, and commerce in violation of (a) New York General Business Law § 349, and (b) similar statutory and common laws of each and every state in which Defendants advertised or promoted the Times Square Club.

**Sixth Claim For Relief**
**(Trademark Dilution In Violation of N.Y. Gen.**
**Bus. Law § 360-*l* and similar laws in other states)**

134.     Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 133 as if fully set forth herein.

135.     The foregoing acts of Defendants injured Plaintiffs' business reputation, and diluted the distinctive qualities of the LAUGH FACTORY trademark and Laugh Factory Logo in violation of (a) New York General Business Law § 360-*l*, and (b) similar statutory and common laws of each and every state in which Defendants advertised or promoted the Times Square Club.

**Seventh Claim For Relief**
**(State and Common Law Trademark Infringement)**

136.     Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 135 as if fully set forth herein.

137.     The foregoing acts of Defendants constituted state and common law trademark and trade dress infringement in violation of the state and common law of the State of New York and each and every other state in which Defendants advertised or promoted the Times Square Club and that recognize state and/or common law trademark and trade dress infringement claims.

### Eighth Claim For Relief
### (State and Common Law Unfair Competition/Misappropriation)

138.     Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 137 as if fully set forth herein.

139.     The foregoing acts of Defendants constituted unfair competition and misappropriation in violation of the state and common law of the State of New York and each and every other state in which Defendants advertised or promoted the Times Square Club and that recognize state and/or common law claims for unfair competition and/or misappropriation.

### Ninth Claim For Relief
### (Breach of Contract)

140.     Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 139 as if fully set forth herein.

141.     Plaintiffs and Defendants had an agreement by which (a) Masada was to be paid $4,500 a week plus provided a rent-free apartment in New York in return for his consulting services and booking services of the Times Square Club; and (b) the members of The LLC were to split the profits from The LLC 50/50.

142.     Defendants breached this agreement by (a) never paying Masada his salary; (b) charging Masada rent on the apartment provided to him for his use while in New York; and (c) never paying The Laugh Factory of Times Square, Inc. any profits from The LLC and never adequately accounting for any profits or losses of The LLC, thereby causing Plaintiffs' damages.

**Tenth Claim For Relief**
**(Breach of Implied Covenant of Good Faith And Fair Dealing)**

143.     Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 142 as if fully set forth herein.

144.     By virtue of the parties' agreement, and by virtue of the parties' business relationship, defendants owed Plaintiffs a duty to act in good faith and conduct good dealing.

145.     By the acts set forth above, Defendants, in bad faith, sought to prevent performance of the agreements between the parties and to withhold the benefits of the agreement between the parties from Plaintiffs.

146.     By the acts set forth above, Defendants, in bad faith, withheld from Plaintiffs the intended benefits of the parties' agreements.

147.     Plaintiffs have been damaged by defendants bad faith conduct.

148.     Plaintiffs are entitled to compensatory and consequential damages.

**Eleventh Claim For Relief**
**(Accounting)**

149.     Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 148 as if fully set forth herein.

150.     Basciano and/or 300 West 43rd Street Realty, Inc. had a fiduciary duty to Plaintiff Laugh Factory of Times Square, Inc. as members of The LLC.

151.     Basciano and/or 300 West 43rd Street Realty, Inc. engaged in wrongful conduct by refusing to share the books and records of The LLC with plaintiff Laugh Factory of Times Square, Inc.

152.     Defendants further engaged in wrongful conduct by, upon information and belief, not paying Plaintiff Laugh Factory of Times Square, Inc. amounts due as a member of the The LLC.

153.     Plaintiff Laugh Factory Times Square, Inc. is entitled to a court-supervised accounting of the profits and losses of The LLC from (i) November 13, 2003 through February 7, 2007; (ii) February 8 through September 14, 2007; and (iii) September 15, 2007 through March 31, 2008.

**Twelfth Claim For Relief**
**(Breach of Fiduciary Duty)**

154.     Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 153 as if fully set forth herein.

155.     Basciano and/or 300 West 43rd Street Realty, Inc. had a fiduciary duty to Plaintiff Laugh Factory of Times Square, Inc. as members of The LLC.

156.     Basciano and/or 300 West 43rd Street Realty, Inc. breached their fiduciary duty to Plaintiff Laugh Factory of Times Square, Inc. by, upon information and belief, diverting revenues from The LLC to Basciano and/or 303 West 42nd Street LLC (or their designees) causing The LLC to appear to be operating at a loss.

31

157.    By virtue thereof, Plaintiff Laugh Factory, Inc. was damaged.

158.    Plaintiff Laugh Factory Inc. is entitled to compensatory, consequential and punitive damages resulting from Defendants' breach of fiduciary duty.

### Thirteenth Claim For Relief
### (Declaratory Judgment)

159.    Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 158 as if fully set forth herein.

160.    Defendants assert that the Coerced February 7 Document and the Coerced February 28,Document are valid and binding.  Masada asserts that they are null, void and of no legal effect due to lack of consideration.

161.    Masada is entitled to a declaration that the Coerced February 7 Document and the Coerced February 28 Document are null, void and of no legal effect.

### Fourteenth Claim For Relief
### (Declaratory Judgment/Rescission)

162.    Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 161 as if fully set forth herein.

163.    Masada was Coerced by Defendants into signing the Coerced February 7 Document, and he did so under duress.

164.    Masada was Coerced by Defendants into signing the Coerced February 28 Document, and he did so under duress.

165.    Defendants' coercion of Masada has been continuing.

166.     Defendants assert that both the Coerced February 7 Document and the Coerced February 28 Document are valid.  Masada asserts that they are null, void and of no legal effect.

167.     Masada is entitled to an order declaring both the Coerced February 7 Document and the Coerced February 28 Document null, void and of no legal effect and/or rescinding both the Coerced February 7 Document and the Coerced February 28 Document.

**Fifteenth Claim For Relief**
**(Declaratory Judgment/Rescission)**

168.     Plaintiffs repeat and reallege each and every allegation contained in paragraphs _ through 167 as if fully set forth herein.

169.     The compensation to be paid to Masada under the Coerced February 28 Agreement is to be paid to Masada from the funds invested in The LLC.

170.     Additionally, the Coerced February 7 Agreement purports to require Masada to perform consulting services after December 30, 2008, at the option of Basciano.

171.     If Masada were to decline to perform such services, Bascianio would be relieved of any responsibility to return to Masada the balance of the funds invested in The LLC.

172.     The obligations imposed upon Masada by the Coerced February 7 Document would constitute involuntary servitude, and enforcement would violate the Federal and New York State Constitutions.

173.     Defendants assert that the Coerced February 7 Document is valid and binding. Masada asserts that it is null, void and of no legal effect.

174. Masada is entitled to an order declaring that the Coerced February 7 Document is null, void and of no legal effect and/or rescinding the Coerced February 7 Document.

**Sixteenth Claim For Relief**
**(Declaratory Judgment)**

175. Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 174 as if fully set forth herein.

176. Defendants assert that the Coerced February 7 Document and the Coerced February 28 Document are valid and binding. Masada asserts that they are null, void, and of no legal effect as they are unconscionable.

177. Plaintiffs are entitled to a declaration that the Coerced February 7 Document and the Coerced February 28 Document are null, void, and of no legal effect.

**Seventeenth Claim for Relief**
**(Fraudulent Inducement)**

178. Plaintiff repeat and reallege each and every allegation contained in paragraphs 1 through 177 as if fully set forth herein.

179. Upon information and belief, Defendants instructed their agent Kolbert to misrepresent to Masada that he was employed by the Times Square BID.

180. Upon information and belief, Defendants knew that Kolbert was not, in fact, employed by the Times Square BID, but rather was an agent of Basciano.

181. The misrepresentation that Kolbert was from the Times Square BID was material to Plaintiffs' decision to enter into a business relationship with Basciano, and Plaintiffs reasonably relied on this misrepresentation.

182. As a result of being fraudulently induced to open the Times Square Club, Plaintiffs suffered damages including, without limitation, being distracted from other profitable business pursuits and losing the funds invested in The LLC.

183. Plaintiffs are entitled to compensatory, consequential, and punitive damages resulting from Defendants' fraudulent inducement.

### Eighteenth Claim For Relief
### (Quantum Meruit)

184. Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 183 as if fully set forth herein.

185. Masada, in good faith, performed services at the Times Square Club including arranging the schedule, booking talent, approving bookings and generally sharing his knowledge of comedy club operations with Basciano's agents.

186. Defendants accepted these services from Masada.

187. Masada expected to be compensated for his services, as he was in fact promised by Basciano he would be.

188. Masada was not compensated for his services.

189. Masada is entitled to be compensated for the reasonable value of his services.

WHEREFORE, Plaintiffs respectfully pray for Judgment to be entered against Defendants as follows:

A. Preliminarily and permanently restraining and enjoining Defendants, any person or entity with which Defendants is affiliated, and his and their respective officers, agents,

servants, employees, and attorneys, and those persons in active concert or participation with them who receive actual notice thereof, jointly and severally:

      i.      from using the LAUGH FACTORY trademark, the Laugh Factory Logo or the Triple Arch Mark in any way in connection with the operation of the Times Square Club, including but not limited to signage, stage design, programs, advertisement or promotional materials, or merchandise;

      ii.      from using on or in connection with any product or service or the (a) any mark, logo, or designation that is confusingly similar to the LAUGH FACTORY trademark, the Laugh Factory Logo or the Triple Arch Mark; and (b) any other false designation of origin or false description or representation or any other thing calculated or likely to cause confusion or mistake in the minds of the public or to deceive the public into the belief that the Times Square Club or any other products or services offered by Defendants are the same as or associated with Plaintiffs' products or services;

      iii.      from representing by any means whatsoever, directly or indirectly, that any products or services sold or provided by Defendants are associated with, sponsored by, and/or connected or affiliated with Plaintiffs or Plaintiffs' products or services or from otherwise taking any action likely to cause confusion, mistake or deception on the part of purchasers as to the origin or sponsorship of Defendants' products or services;

      iv.      from causing, engaging in or permitting others to do any of the aforesaid acts;

B.      Directing Defendants to deliver up to this Court for impoundment, destruction or other disposition, all products and materials in his possession or control that violate any of

the provisions of Paragraph A, above, including, without limitation, all comedy club stage elements or components, merchandise, transfer designs, packaging, package inserts, labels, signs, indoor or outdoor marquees, prints, wrappers, receptacles, advertising or other materials, and the means for making or reproducing same, which violate the provisions of Paragraph A above, or any portion thereof;

C.      Directing Defendants to file with the Court and serve upon counsel for Plaintiffs, within thirty (30) days after entry of any preliminary or permanent injunction issued by the Court in this action, a sworn written statement as provided in 15 U.S.C. § 1116 setting forth in detail the manner and form in which Defendants have complied with the injunction;

D.      Directing Defendants to account for and relinquish to Plaintiff Laugh Factory Times Square, Inc. all direct and indirect gains, profits, and advantages derived from Defendants' wrongful acts as described above;

E.      Directing that Defendants' direct and indirect gains, profits, and advantages derived from Defendants' wrongful acts as described above be placed in a constructive trust for the benefit of Plaintiff Laugh Factory Times Square, Inc.;

F.      Directing that Defendants pay Plaintiffs such damages as Plaintiffs have sustained as a consequence of Defendants' wrongful acts complained of herein;

G.      Directing that the aforesaid amounts be multiplied or otherwise enhanced as authorized by law;

H.      Awarding Plaintiffs, on their state law claims, compensatory and consequential damages in an amount to be determined at trial;

I.      Directing a court-supervised accounting of The LLC and the Times Square Club;

J.      Awarding Plaintiffs punitive damages in such amount as may be determined at trial, but not less than $15 million;

K.      Declaring that the Coerced February 7 Document and the Coerced February 28 Document are null, void and of no legal effect or, alternatively, entering an order rescinding both of them;

L.      Declaring that as of September 14, 2007, Laugh Factory of Times Square, Inc. was no longer a member of The LLC;

M.      Declaring that Defendants are estopped from asserting that any Plaintiff has any obligation to The LLC.

N.      Awarding Plaintiffs prejudgment interest according to the law;

O.      Finding this to be an "exceptional case" within the meaning of the Lanham Act, and directing that Defendants pay Plaintiffs the costs of this action and its reasonable attorneys' fees; and

P.      Granting Plaintiffs such other and further relief as the Court may deem just and proper.

Plaintiffs request a jury on all issues so triable.


Dated:  New York, New York
        June 16, 2008

                          PROSKAUER ROSE LLP


                          By: _s/Jenifer deWolf Paine/s_____
                              Gregg M. Mashberg (GM 4022)
                              Brendan J. O'Rourke (BO 2351)
                              Jenifer deWolf Paine (JP 9393)
                              1585 Broadway
                              New York, NY  10036
                              Tel: 212.969.3000
                              Fax: 212.969.2900

                          Attorneys for Plaintiffs and Third Party Defendants